**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 10-5332**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

JOHN ANDREW MUDLOCK,

Defendant - Appellant.

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  William L. Osteen, Jr., District Judge.  (1:10-cr-00115-WO-1)

Argued:  March 21, 2012                    Decided:  June 19, 2012

Before NIEMEYER, GREGORY, and FLOYD, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** J. David James, SMITH, JAMES, ROWLETT & COHEN, LLP, Greensboro, North Carolina, for Appellant.  Michael Francis Joseph, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.  **ON BRIEF:** Ripley Rand, United States Attorney, Greensboro, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

The grand jury indicted John Andrew Mudlock for knowingly possessing firearms in contravention of a restraining order issued by a Tennessee court, in violation of 18 U.S.C. §§ 922(g)(8) and 924(a)(2). Mudlock filed a motion to dismiss the indictment, alleging that, as applied to him, § 922(g)(8) was unconstitutional under the Second Amendment. The district court denied the motion. After trial, the jury returned a guilty verdict. The district court subsequently sentenced Mudlock to 42 months' imprisonment. In this timely appeal, Mudlock challenges the district court's constitutionality determination, several evidentiary rulings, and aspects of his sentencing. For the reasons that follow, we affirm.

I.

A.

Early in the morning on January 10, 2010, Mudlock telephoned the 911 dispatcher in Rockingham County, North Carolina, and hung up. When the 911 operator called back, Mudlock stated that he was going to kill himself and that he would shoot any law enforcement officer who approached his home. He stated that he had enough weapons to take out "anybody that came through the door."

2

After an all-day standoff, at around 8:00 p.m., officers fired tear gas into Mudlock's home, which caused him to surrender. Officers handcuffed Mudlock, but when his hands were temporarily freed because of a problem with the handcuffs, he attempted to grab one of the officers' guns. The government played a video of this incident at trial.

After the officers secured Mudlock, Detective Benjamin Strader obtained a search warrant for his home. The search produced six firearms and numerous rounds of ammunition. Three of the firearms were loaded.

On May 2, 2010, Mudlock, who remained in jail, telephoned Justin Herr to ask that Herr remove three "fishing poles" from Mudlock's home. When Herr went to the home, however, he found firearms in place of the purported fishing poles. He also found ammunition. Herr informed ATF Special Agent Paul Johnson of his discovery.

Johnson subsequently obtained another search warrant for Mudlock's home. He executed the search warrant on May 6, 2010. During the search, he located and seized three firearms in an open gun safe in Mudlock's bedroom closet and approximately 4,000 rounds of ammunition.

At the sentencing hearing, ATF Special Agent David M. Schauble, who also participated in the May 6, 2010, search and took pictures of the scene, testified about what he had

3

observed.  During this testimony, he spoke about a photograph that he took of a high-capacity magazine that accepted more than fifteen rounds of ammunition.  According to Schauble, officers found the magazine in a dresser that was two or three steps from the open gun safe where they located the three guns, one of which was capable of accepting the magazine.

During all relevant time periods, Mudlock was subject to a domestic restraining order that barred him from lawfully possessing firearms.  The restraining order provided that Mudlock "received actual notice of the hearing; that [Mudlock] had an opportunity to participate in the hearing"; and that he was "restrained from committing further acts of abuse, domestic abuse, stalking or sexual assault or threats of abuse, stalking or sexual assault against" his wife or her minor children.  It also stated that Mudlock had "made a general appearance . . . and ha[d] submitted himself to the jurisdiction of [the court.]"  The order further announced that Mudlock "represents a credible threat to the physical safety of [Ms. Mudlock]."  And, it required that Mudlock "terminate [his] physical possession of the firearms [in his possession] by any lawful means."  The order states that, barring a continuation, it would be in effect for one year.  Mudlock signed the order on August 18, 2009.

The grand jury indicted Mudlock on March 30, 2010, for possession of firearms while subject to a restraining order, in violation of 18 U.S.C. §§ 922(g)(8) and 924(a)(2).  Mudlock subsequently filed a motion to dismiss the indictment, arguing that § 922(g)(8) was unconstitutional as applied to him.  The district court denied the motion.

A jury trial commenced on July 1, 2010.  On July 2, 2010, the jury returned a verdict of guilty as charged.  On September 13, 2010, Mudlock filed a motion seeking substitute counsel.  The district court held a sentencing hearing on November 17, 2010, at which time it denied Mudlock's motion.  It subsequently sentenced him to 42 months' imprisonment.  Mudlock thereafter filed this timely appeal.

## II.

First, Mudlock argues that the district court erred in denying his motion to dismiss the 18 U.S.C. § 922(g)(8) charge because, as applied to him, this statute infringes on his Second Amendment rights.  We review this question de novo.  United States v. Buculei, 262 F.3d 322, 327 (4th Cir. 2001).

Section 922(g)(8) forbids those persons who are subject to an active domestic violence protection order from possessing firearms or ammunition while the order is in effect.

Specifically, the statute makes it unlawful for any person under a court order that

> (A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;
>
> (B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and
>
> (C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or
>
> (ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury;
>
> * * * *
>
> to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(8).

The Supreme Court determined in District of Columbia v. Heller, 554 U.S. 570 (2008), that the Second Amendment protects the individual "right of law-abiding, responsible citizens to use arms in defense of hearth and home." Id. at 635. But the Court made clear that the right is not unlimited and listed presumptively lawful restrictions, including the prohibition on the possession of firearms by felons and the mentally ill, as

6

well as the carrying of weapons in certain places.  Id. at 626-27.

Our review of Mudlock's constitutional challenge entails a two-step inquiry.  United States v. Chester, 628 F.3d 673, 680 (4th Cir. 2010).  First, we must determine whether § 922(g)(8) infringes on conduct within the purview of the Second Amendment's guarantee, as that right has been historically understood.  United States v. Chapman, 666 F.3d 220, 225 (4th Cir. 2012) (citing Chester, 628 F.3d at 680).  "If the answer to this question is no, that is the end of the matter.  If the answer is yes, then we move on to consider the second part of the two-part approach, which involves application of the appropriate form of means-end scrutiny."  Id. (citation omitted) (citing Chester, 628 F.3d at 680).

For purposes of this appeal, we assume that Mudlock's conduct falls within the purview of the Second Amendment.  Thus, we focus of the second step of the inquiry.  And in doing so, we must first determine the appropriate level of scrutiny.

Like that of the defendant in Chapman, Mudlock's "claim is not within the core right identified in Heller—the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense."  Id. at 226 (emphasis omitted).  This is so because we are hard-pressed to think of an instance in which a responsible citizen would be (1) "restrained from committing

7

further acts of abuse, domestic abuse, stalking or sexual assault or threats of abuse, stalking or sexual assault against" another or (2) adjudged to "represent[] a credible threat to the physical safety of [another]." Moreover, in view of Mudlock's statement to the 911 dispatcher stating that he would shoot any law enforcement officer who approached his house, it can hardly be said that Mudlock is law-abiding. "Accordingly, we conclude that intermediate scrutiny is the appropriate standard of scrutiny for [Mudlock] and similarly situated persons." Id.

We have previously held in considering a constitutional challenge to § 922(g)(8) that the statute serves the substantial government objective of "reducing domestic gun violence" and that there is a "reasonable fit" between the law and this objective. United States v. Mahin, 668 F.3d 119, 124-25 (4th Cir. 2012) (internal quotation marks omitted). Specifically we have held that the government has established the following:

> (1) domestic violence is a serious problem in the United States; (2) the rate of recidivism among domestic violence misdemeanants is substantial; (3) the use of firearms in connection with domestic violence is all too common; (4) the use of firearms in connection with domestic violence increases the risk of injury or homicide during a domestic violence incident; and (5) the use of firearms in connection with domestic violence often leads to injury or homicide.

Chapman, 666 F.3d at 229.

8

We have reviewed the record and find nothing that would render the application of the statute unconstitutional in this case. As the district court found, § 922(g)(8) provides for a time-limited restriction, which is applicable only while the restraining order is in effect. It also requires that specific procedural safeguards be present at the restraining order stage before that order can trigger the firearm restriction. The forbidden conduct entails serious or other conduct that would cause reasonable fear of bodily injury. Lastly, the statute requires that the restraining order contain a finding that the defendant has been adjudged to be a specific and "credible threat to the physical safety" of another or that it explicitly prohibit the use of force or threatened force "that would reasonably be expected to cause bodily injury." § 922(g)(8). In that we agree with the district court that all of these factors are present in this case, we adopt the reasoning of the district court.

Consequently, in that we have found that there is a reasonable fit between § 922(g)(8) and the substantial governmental objective of reducing domestic gun violence, we affirm the district court's decision to deny Mudlock's motion to dismiss.

III.

Next, Mudlock contends that the district court erred in sentencing him based upon an incorrect base offense level.

We review sentences for reasonableness under an abuse-of-discretion standard. Gall v. United States, 552 U.S. 38, 51 (2007). Pursuant to this review, we must consider both the procedural and substantive reasonableness of a sentence. Id.; see also United States v. Lynn, 592 F.3d 572, 575 (4th Cir. 2010). Properly preserved claims of procedural error are subject to harmless-error review. Lynn, 592 F.3d at 576. If the sentence is free of significant procedural error, we then review the substantive reasonableness of the sentence. Id. at 575; United States v. Pauley, 511 F.3d 468, 473 (4th Cir. 2007). When judging the reasonableness of a sentence, we "review the district court's legal conclusions de novo and its factual findings for clear error." United States v. Hampton, 441 F.3d 284, 287 (4th Cir. 2006).

Pursuant to U.S.S.G. § 2K2.1(a)(4)(B), Mudlock's base offense level was set at twenty. For this guideline to apply, it requires, among other things, that the offense involved a "semiautomatic firearm that is capable of accepting a large capacity magazine." Id. The application notes to this guideline define this term to include the following:

a semiautomatic firearm that has the ability to fire many rounds without reloading because at the time of the offense (A) the firearm had attached to it a magazine or similar device that could accept more than 15 rounds of ammunition; or (B) a magazine or similar device that could accept more than 15 rounds of ammunition was in close proximity to the firearm.

Id. § 2K2.1 cmt. n.2.

Mudlock first argues that the district court erred in concluding that he possessed a firearm capable of accepting a large capacity magazine and that the magazine was in close proximity to the firearm on January 10, 2010, the date of the alleged offense. But our review of the record shows that the evidence does not comport with these contentions.

At the sentencing hearing, Agent Schauble testified as follows:

> Q: Agent Schauble, do you know if what is described as a high capacity magazine was seized from the residence that day?
> A: Yes, ma'am.
> Q: Could you explain to the Court what a high capacity magazine is exactly?
> A: It's a magazine that will fit—can carry more than 15 rounds. In this particular case, that magazine would carry 30 rounds.
> Q: And you actually saw that magazine yourself and have determined that it will accommodate more than 15 rounds of ammunition?
> A: Yes, ma'am.
>
> * * * *
>
> Q. And there are two—actually two firearms in this photograph. Which is which in the photograph?
> A: There's actually three firearms. There's an SKS 7.62 by 39 here, which is a double-barreled shotgun. To the left of the gun—in the left-hand

11

corner of the gun safe, and there's another rifle in the right-hand corner of the gun safe.

* * * *

Q:    All right.  And Government's No. 5?
A:    That is the magazine for the SKS that was found in the top dress—top right-hand dresser drawer in the bedroom.

* * * *

Q:    And proximity wise, how many steps would you have had to have taken from the dresser to get to the gun safe?
A:    Two or three.

* * * *

Q:    Would you estimate that's about 10 feet?
A:    Yes, sir, six to eight—six to 10 feet.

Given this undisputed testimony, we cannot say that the district court erred in finding that Mudlock possessed a firearm, in this instance an SKS, capable of accepting a large capacity magazine and that such a magazine was in close proximity to the firearm at the time of the alleged offense. Hence, Mudlock's claim to the contrary fails.

Second, Mudlock claims that the ban on firearms capable of accepting large capacity magazines has been repealed. Therefore, according to Mudlock, the increased punishment under the Sentencing Guidelines for possession of such a firearm is unreasonable.  But we have already considered this issue and decided that "the repeal of the assault-weapon ban did <u>not</u> operate as a repeal of the 2005 enhancement."  <u>United States v.</u>

12

<u>Myers</u>, 553 F.3d 328, 330 (4th Cir. 2009). Accordingly, this claim must fail as well.

## IV.

Mudlock also maintains that the district court committed reversible error in its refusal to allow him to present evidence concerning the Tennessee court hearing that led to the imposition of the restraining order. Our review of the district court's admission of evidence is for an abuse of discretion. <u>United States v. Wilson</u>, 624 F.3d 640, 649 (4th Cir. 2010).

"[T]he overwhelming weight of federal case law precludes a defendant in a § 922(g)(8) prosecution from mounting a collateral attack on the merits of the underlying state protective order." <u>United States v. Reese</u>, 627 F.3d 792, 804 (10th Cir. 2010). In fact, the Fifth Circuit has noted that "nothing in the language of 18 U.S.C. § 922(g)(8) indicates that it applies only to persons subject to a <u>valid</u>, as opposed to an <u>invalid</u>, protective order." <u>United States v. Hicks</u>, 389 F.3d 514, 535 (5th Cir. 2004). Mudlock has not presented, and we have not found, any reason to diverge from the majority approach. As such, we find no error in the district court's disallowance of any evidence concerning the Tennessee court hearing.

V.

According to Mudlock, the district court also erred in admitting certain evidence at his trial that was not charged in the indictment and was irrelevant to the charges contained in the indictment. Specifically, Mudlock objects to the district court's admission of (1) evidence concerning his request to Herr that Herr remove firearms from Mudlock's home and (2) evidence regarding his attempt to grab one of the officers' guns. As noted above, we review the district court's admission of evidence for abuse of discretion. Wilson, 624 F.3d at 649.

At trial, the government was required to prove beyond a reasonable doubt that Mudlock "knowingly" possessed firearms. See § 924(a)(2). And, as the district court observed, Mudlock's statements and conduct "that reflect his knowledge of the firearms that were present in his home and, to a certain degree, his control of those firearms," including his statements to Herr, relate to his "knowing possession." Therefore, we hold that this evidence was "admitted as to acts intrinsic to the crime charged, and . . . not admitted solely to demonstrate bad character." United States v. Chin, 83 F.3d 83, 88 (4th Cir. 1996) (citing United States v. Allen, 960 F.2d 1055, 1058 (D.C. Cir. 1992)). Moreover, to assure that the jury did not consider the evidence for anything but Mudlock's state of mind, the

14

district court gave a limiting instruction to the jury. Thus, the district court properly admitted this evidence. See id.

Mudlock's assignment of error to the district court's admission of evidence concerning Mudlock's grabbing of an officer's gun fares no better. The district court noted, "I think here this is some evidence of a knowing possession of firearms, . . . continued even after he was placed into custody. . . . I think it's part of the transaction, and I also think it's probative of that knowledge and intent on his part." To ameliorate any unfair prejudice, the district court gave a limiting instruction as to this evidence as well. Accordingly, we find no abuse of discretion.

VI.

Finally, Mudlock states that the district court erred in refusing to appoint substitute counsel prior to his sentencing. Our review of a district court's decision on a motion to substitute counsel is for abuse of discretion. United States v. Reevey, 364 F.3d 151, 156 (4th Cir. 2004).

It is axiomatic that an indigent defendant has a Sixth Amendment right to counsel. Gideon v. Wainwright, 372 U.S. 335, 343-45 (1963). But the exercise of this right "cannot 'deprive courts of the exercise of their inherent power to control the administration of justice.'" United States v. Perez, 661 F.3d

15

189, 191 (4th Cir. 2011) (quoting United States v. Gallop, 838 F.2d 105, 108 (4th Cir. 1988)). Thus, an indigent defendant is entitled to substitute appointed counsel only for good reason. Id.

"Our review of denial-of-substitution claims has focused on three inquiries: (1) the timeliness of the motion; (2) the adequacy of the court's subsequent inquiry; and (3) 'whether the attorney/client conflict was so great that it had resulted in total lack of communication preventing an adequate defense.'" United States v. Smith, 640 F.3d 580, 588 (4th Cir. 2011) (quoting Gallop, 838 F.2d at 108). There is no dispute that Mudlock's motion was timely. Therefore, we consider only factors two and three.

As to the adequacy-of-the-inquiry prong, according to Mudlock, the district court failed adequately to inquire into or consider the following alleged shortcomings of his counsel: counsel's failure to obtain documentation regarding the Tennessee proceedings, despite Mudlock's request; counsel's failure to review Mudlock's objections to the Presentence Report with him; counsel's instruction to Mudlock that he should write directly to the probation office regarding his objections; and counsel's failure to accept or return Mudlock's telephone calls. Contrary to Mudlock's contention, the record shows the district

court made an extensive inquiry into Mudlock's complaints. There was more than sufficient discussion to satisfy this prong.

All said, from our review of the record, it appears that Mudlock's chief complaint about his counsel concerns the validity of the restraining order and the gun enhancement. But, as discussed above, Mudlock's arguments regarding the restraining order lack merit. And we have never held that an attorney who declines to make unmeritorious claims demanded by a client risks being replaced. Mudlock's counsel made arguments regarding the gun enhancement, which the district court properly rejected. Thus, as the district court observed, "I don't see that there's any reason to believe that it [would have been] any better by substituting counsel."

Concerning the communication prong, Mudlock complains that there was a complete breakdown of communication between him and his counsel and that the district court erred in holding otherwise. Mudlock states that he detailed for the district court the alleged unacceptable length of time that his counsel failed to communicate with him. Moreover, Mudlock avows that, even when he was able to communicate with his counsel, his counsel failed to take action on his behalf or explain to him the reason or reasons that he could not take the requested action. Instead, according to Mudlock, his counsel merely instructed him to contact court officials himself.

17

The district court aptly summarized the record before us, however, by stating that Mudlock and his counsel had "been discussing the case," but "there [was] disagreement over what constitutes a meritorious objection and what doesn't." In light of the fact that these discussions were occurring, we are unable to say that there was a total breakdown of communication.

Accordingly, the district court did not abuse its discretion in refusing to appoint substitute counsel prior to sentencing.

## VII.

Wherefore, for the reasons stated above, Mudlock's conviction and sentence are

AFFIRMED.